# UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF WASHINGTON

**KAREN A. OVERSTREET**
Chief Judge

**UNITED STATES COURTHOUSE**
700 Stewart Street
Suite 7216
Seattle, Washington 98101-1271
Phone: 206-370-5330
Fax: 206-370-5335
www.wawb.uscourts.gov

October 6, 2006

**VIA CM/ECF**

Mr. Richard D. Granvold
31620 23rd Ave. S., Suite 205
Federal Way, WA 98003-5049

Mr. Robert P. Brouillard
Assistant United States Attorney
700 Stewart Street, Suite 5220
Seattle, WA 98101-1271

Re: *Timothy Obenchain v. U.S. Dept. of Education (In re Obenchain*; Adv. Case No. 05-01184

**COURT'S LETTER RULING**

Dear Counsel:

This matter came before me for trial on August 29, 2006. This is an action by the debtor, Timothy Obenchain, against the United States Department of Education ("DOE") to determine the dischargeability of student loan debt under Bankruptcy Code § 523(a)(8).

This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I), and I have jurisdiction to hear this matter under 28 U.S.C. § 157(a) and (b), § 1334(a) and (b), and 11 U.S.C. § 523. The following constitute my findings of fact and conclusions of law for purposes of Bankruptcy Rule 7052 as to the matters tried on August 29, 2006.

**I. General Findings of Fact.**

The Plaintiff is a single, 38 year-old male with no long-term health issues and no dependents. He filed a petition for relief under Chapter 7 on February 1, 2005. He received a discharge on May 11, 2005. The testimony at trial was that Plaintiff had a girlfriend he described in his deposition as his

"life partner" living with him for the last ten years, with whom he combined income and shared expenses. According to Plaintiff's testimony, she moved out of their apartment shortly before the trial.

<u>The Student Loans</u>: Plaintiff took out various loans from 1992 to 1994 to pursue study at the ITT Technical Institute ("ITT"). He received an Associate degree in electrical engineering from ITT. The payments on Plaintiff's student loans became due after he graduated from ITT in 1996. The loans at issue in this case were reconsolidated with direct loans and purchased by DOE in 2001. Specifically, the Plaintiff is obligated to DOE on two Federal Direct Consolidation Loans: (1) a subsidized loan of $3,622.18 disbursed on August 28, 2001, and (2) an unsubsidized loan of $46,553.49 disbursed on August 28, 2001 (collectively, the "Loans"). [Ex. D-4].

<u>Income</u>:  Plaintiff worked at light construction and delivery jobs prior to attending ITT. After graduating from ITT, he worked for a year wiring ovens in a factory and then did contract work on computers for Computer Stop and CompuVision, where he earned approximately $10 per hour. Plaintiff then switched to cable TV installation before becoming a delivery driver for Alpine Courier. Plaintiff's original Schedule I indicated he was employed by Alpine Courier and had a monthly income of $3,667.40. Alpine Courier was sold, however, and Plaintiff's employment terminated. An amended Schedule I was filed August 18, 2006. The schedule reflects that Plaintiff is now employed by Washington Machine Works. Plaintiff described his duties there as cleaning floors, making deliveries and drilling holes. The highest hourly rate he has earned on this job is $13.50 per hour.

Each party submitted a different calculation of Plaintiff's gross and net income based upon Ex. P-26. Ex. P-26 indicates that for the time period from January 1, 2006 through August 3, 2006, Plaintiff earned a gross amount of $17,999.15 and a net amount of $14,191.74. In the last two-week pay period shown in Ex. 26, Plaintiff's gross income was $1,262.25, including nine hours of overtime pay. His net monthly income, including a deduction of $20 for medical and dental, was $990.08. Relying on his counsel's complicated calculations (which isolate daily income and deduction amounts and compute them for a year), Plaintiff testified that he has monthly gross income of $2,528.22 and monthly net income of $1,993.45. Plaintiff also testified that he expects his income to decrease by approximately $87 per month starting in September 2006 when he switches from the night shift to the day shift. The DOE calculated Plaintiff's monthly

net income at $2,188.51. This amount is calculated by using net income for the last two-week pay period in Ex. 26, **not** including the $20 deduction for medical and dental, multiplying the amount by 26 and then dividing the total by 12.

The Court finds that Plaintiff's monthly net income is $2,145.17. This amount is calculated by taking the net income for the last two week pay period in Ex. 26, **including** the deduction for medical and dental, multiplying the amount by 26 (for the number of pay periods in a year), and dividing the total by 12.

Expenses: Plaintiff testified his expenses are somewhat in flux due to the breakup with his girlfriend, Sandra Hilsenberg. For the last 10 years, up until about a week before trial, Plaintiff testified he had been sharing income and expenses with Ms. Hilsenberg. Although they both testified that Ms. Hilsenberg moved out shortly before trial, neither provided testimony that was altogether credible. Plaintiff testified that although Ms. Hilsenberg moved out of their apartment and moved in with her father, she had not removed her personal belongings from their apartment, including her cat. Plaintiff testified that since moving out, Ms. Hilsenberg had returned to clean the cat's litter box. When asked whether he had any reason to believe they would not be living together in the future, Plaintiff responded that he could not predict the future. Ms. Hilsenberg testified that she had moved in with her father and that he did not have sufficient room for her personal belongings. In addition, she testified she was considering moving to Michigan to care for her mother. She did not describe any firm plans to do so, including whether she intended to quit her current employment in order to move. Ms. Hilsenberg also testified she would continue to pay one-half of the monthly payment on the Dodge Dakota she and Plaintiff purchased together after this bankruptcy was filed.

Plaintiff's monthly expenses, assuming he will be living by himself in the future, are set forth in Schedule J in Ex. P-3. His total expenses are listed at $2,671.43, so they exceed his current monthly net income of $2,145.17 by just over $500. Schedule J reflects that Plaintiff's current rent for a two bedroom apartment is $785 per month. In light of Ms. Hilsenberg's apparent departure, Plaintiff testified that he would be looking for a one bedroom apartment when his lease expires in March 2007 and expects his rent to be reduced to $710 per month. Plaintiff has significant automobile expenses because of the new Dodge Dakota he and Ms. Hilsenberg purchased in June of 2005. [Ex. P-9]. The monthly payment on the Dodge is over

$700, and Plaintiff testified that his one-half of the payment is about $351 per month. Plaintiff testified that the amount he and Ms. Hilsenberg owe on the truck is more than the vehicle is worth and Plaintiff claimed he is unable to sell it or trade it in on another vehicle. Plaintiff uses the Dodge to drive to and from work, which is approximately 50 miles round trip. Plaintiff testified that once he moves to the day shift, it may be possible for him to use public transportation to get to work. Plaintiff's budget includes $45.95 per month for internet, which he is not required to have for his employment. His budget also shows miscellaneous personal expenses of $289.67/month for chewing tobacco ($40/month), pet food, health club fees ($40.67/month), personal grooming and attorneys' fees for his bankruptcy attorney. Plaintiff testified at trial that he no longer has a health club membership, therefore his personal expenses are $249 per month. Plaintiff further testified that since his bankruptcy he has incurred approximately $400 on his credit card, a payday loan of $600 and approximately $1,000 borrowed from his mother.

Loan Repayment: Plaintiff selected the Income Contingent Repayment Plan ("ICRP") when the Loans were consolidated in 2001. Plaintiff was granted a forbearance from October 21, 2001 to April 21, 2002, apparently due to unemployment. [Exs. P-21, P-22]. It appears that other deferments or forbearances were requested, but no evidence was presented to demonstrate whether these were granted. [Ex. P-25]. As of the date of the bankruptcy filing, the combined amount due on the Loans was $64,453.74, with interest of 8.13% (with a cap of 8.25%). A payment default on the Loans occurred on June 18, 2003.[1]

There was conflicting testimony at trial regarding the repayment amount due under the Loans. Plaintiff contended the payments were $215.08 per month. [Ex. P-20]. Ms. Davis of the DOE testified that Plaintiff's payment would have been $108.52 under the ICRP. Plaintiff's testimony was that he was not made aware of the $108.52 per month option. It was not disputed that

---

[1] There was a dispute of fact between the parties as to when the default occurred. Sherrol Davis, who testified for the government at trial, stated that the default occurred on June 18, 2003. Plaintiff could not remember the date of default, but his counsel contended that the date of default was September 14, 2003, based upon the DOE's answer to Interrogatory 5.n in Ex. P-5. Plaintiff's counsel misreads that answer, however. The answer refers to the date of the transfer of the Loans to FSA/Borrower Services on September 14, 2003, following default.

aside from two or three payments made when the student loans originally became due and before the Loans were purchased by DOE, Plaintiff made no payments on these obligations. Further, other than a single phone call made by Ms. Hilsenberg to the student loan agency, Plaintiff has made no effort to negotiate a payment amount, determine consolidation options or otherwise attempt a resolution of amounts owing.

**II. Specific Findings of Fact and Conclusions of Law.**

    A.    The *Brunner* Requirements.

Section 523(a)(8) provides that a student loan of the type at issue in this case is nondischargeable "unless excepting such debt from discharge ... will impose an undue hardship on the debtor and the debtor's dependents." The Ninth Circuit Court of Appeals has adopted the three-part test from *In re Brunner*, 46 B.R. 752 (S.D.N.Y. 1985), *aff'd*, 831 F.2d 395 (2d Cir. 1987) to determine whether excepting a student loan from discharge constitutes an undue burden on a debtor. *United Student Aid Funds, Inc. v. Pena (In re Pena)*, 155 F.3d 1108 (9th Cir. 1998). Under *Brunner*, a student loan is dischargeable only if:

        1.    The debtor cannot, based on current income and expenses, maintain a "minimal" standard of living for himself or his dependents if forced to repay the loans;

        2.    additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period of the student loans; and

        3.    the debtor has made good faith efforts to repay the loans.

Plaintiff has the burden of proving each of the above elements by a preponderance of the evidence. The DOE has the burden of proving by a preponderance of the evidence that (1) the debt is in fact an educational loan, (2) the loan was made, and (3) the loan was insured/guaranteed by a governmental unit or was made under a program funded in whole or in part by a governmental unit or non-profit institution. Plaintiff has stipulated to these facts so DOE has met its burden.

B.  Plaintiff's Ability to Maintain a Minimal Standard of Living.

Plaintiff must prove that he cannot, based on his current income and expenses, maintain a "minimal" standard of living for himself if forced to repay the loan. I conclude that Mr. Obenchain has met this burden. The first prong of the *Brunner* Test requires more than a showing of tight finances. *United States Aid Funds, Inc. v. Nascimento (In re Nascimento)*, 241 B.R. 440, 445 (9th Cir. BAP 1999). In defining undue hardship, courts require more than temporary financial adversity but typically stop short of utter hopelessness. In *In re Nys*, 446 F.3d 938 (9th Cir. 2006), the 9th circuit endorsed the trial court's review of the following nonexclusive factors relevant to the *Brunner* elements:

(1) Serious mental or physical disability of the debtor or a dependent of the debtor which prevents employment or advancement;
(2) The debtor's obligations to care for dependents;
(3) Lack of, or severely limited education;
(4) Poor quality of education;
(5) Lack of usable or marketable job skills;
(6) Underemployment;
(7) Maximized income potential in the chosen educational field, and no other more lucrative job skills;
(8) Limited number of years remaining in the debtor's work life to allow payment of the loan;
(9) Age or other factors that prevent retraining or relocation as a means for payment of the loan;
(10) Lack of assets, whether or not exempt, which could be used to pay the loan;
(11) Potentially increasing expenses that outweigh any potential appreciation in the value of the debtor's assets and/or likely increases in the debtor's income; and
(12) Lack of better financial options elsewhere.

Except for a brief period of unemployment, Plaintiff has been fairly consistently employed since the Loans first became due. He works full time, taking as much overtime as possible from his current employer. His degree from ITT has not enabled him to earn substantially more than he can in his current employment. He testified that when he left the computer industry he was making about $10 per hour. On cross-examination by DOE's counsel, Plaintiff admitted that at his deposition he testified

that had he stayed in that business, he might be making $15 or $16 per hour rather than the $13.50 per hour he earns on his current job. Plaintiff's job skills and education are limited and there is no evidence that this will improve significantly in the future. Even if Plaintiff could earn $15 per hour in the computer industry, his gross pay would be what it is today (80 hours at $15/hr is equal to $1200). There is no evidence that he has any prospects for substantially increasing his income in the future. Plaintiff has no significant assets and there is no evidence that he has any savings for retirement other than his contributions to social security. Plaintiff does not take regular vacations. Although Plaintiff testified that he recently had a hernia which prevented him from working for a day, there is no evidence of any long term illness or medical condition that should affect his ability to work. He has no dependents to care for at this point.

As previously noted, Plaintiff's expenses are not completely fixed because of his separation from Ms. Hilsenberg. Although Plaintiff could reduce his expenses somewhat by moving to a one bedroom apartment, canceling his internet service and quitting his habit of chewing tobacco, the anticipated savings will not bridge the gap of his current excess of $677 in expenses over income. Even if he was forced to sell the Dodge Dakota and purchase a cheaper, more economical car, plaintiff will still suffer a monthly shortfall of several hundred dollars. With the exception of the purchase of the Dodge Dakota, Plaintiff has made reasonable attempts to minimize his expenses. He has consistently shared expenses with Ms. Hilsenberg and has few excesses in his life.

      C.   Additional Circumstances.

The debtor must demonstrate his inability to pay in the present and a likely inability to pay in the future. *In re Nys*, *supra*. He need not demonstrate exceptional circumstances beyond that. *Id.* Specifically, the debtor must demonstrate that his inability to pay will likely persist throughout a substantial portion of the loan repayment period. *Id.* at 947. The Court finds that Plaintiff has met that burden. There is no suggestion, as in *Nys*, that Plaintiff has purposefully adopted a lifestyle that prevents him from repaying his student loans. Exhibit P-16 contains Plaintiff's W-2 forms since 1999. Those forms show no significant increase in income over the last seven years.

In the instant case, aside from a possible bad decision in purchasing the Dodge Dakota, which was excusable given the circumstances at the time of purchase, Plaintiff lives frugally and has made reasonable choices about his income and expenses. Although the Court is not persuaded that Plaintiff and Ms. Hilsenberg will not reconcile at some point in the future, the Court concludes that such a reconciliation would not significantly improve Plaintiff's income and expenses sufficiently to enable him to repay the Loans, or any part of them.

        D.    Good Faith.

Plaintiff must prove that he has made good faith efforts to repay the Loans. "Good faith is measured by the debtor's efforts to obtain employment, maximize income, and minimize expenses." *In re Birrane*, 287 B.R. 490 (9th Cir. BAP 2002). *Birrane* states that good faith is also measured by the debtor's effort to negotiate a repayment plan. In *Birrane*, the debtor made payments on her loan for some period of time and had made efforts to negotiate repayment, even though those efforts were denied. Then the debtor was informed at trial of an ICRP option for repayment. The Court found she lacked good faith in not having discussions with the lender about that option. *Birrane* found that the debtor's failure to maximize her income and her failure to take steps to renegotiate payment were indications of a lack of good faith such that discharge of her student loan should be denied.

As stated above, I find that the Plaintiff has maximized his income given his employment prospects. The one excess apparent in his expenses is the payment on the Dodge Dakota. That is a car he cannot afford and should, in retrospect, not have purchased. Plaintiff testified that at the time the Dodge was purchased, he and Ms. Hilsenberg needed a truck as they were both delivering pharmaceutical supplies for Alpine. Unfortunately, their employment terminated shortly after the truck was purchased on account of circumstances beyond their control.

Plaintiff has not made any payments on the student loans in 12 years. He had a deferment of approximately one year when he would not have been required to make payments. The testimony at trial was that Plaintiff made two or three payments on the Loans when they initially became due. Plaintiff contends that because of his limited income he was not able to make payments on the Loans. The evidence at trial was that Plaintiff was given notice of a $215.08 payment amount in March of 2002. This amount was based on the ICRP. At that time Plaintiff would have been

eligible for standard, extended, graduated and income contingent plans. However, after he defaulted in 2003, he was no longer eligible for these plans. Ms. Davis, DOE's witness, testified that the loans could have been rehabilitated at that time if Plaintiff made a "reasonable and affordable payment." Although Ms. Davis testified that *she* would agree that Plaintiff could make 12 payments of $108.52 per month to get back on the income contingent plan, there is no evidence that payment amount was ever made available to Plaintiff prior to trial. In fact, Ms. Davis testified that the determination by the loan officer in charge of what is "fair and reasonable" under the student loan regulations is purely subjective and would have been up to the officer in charge of Plaintiff's loan at the time of the default.

Ms. Hilsenberg testified that she tried, without success, to negotiate a payment of $100 per month. Plaintiff understood that he would have to pay $966.80 per month before the loans could be rehabilitated, an amount he clearly was not able to afford. [Ex. P-5, p.4]. Ms. Davis testified that in the absence of a default, Plaintiff had the following payment options: he could pay $697.50 over a 10 year period under the standard plan; $446.14 for 25 years under the extended plan; $387.29 for the first two years under the graduated plan; or $172 under the ICRP (assuming income of $10,157). Plaintiff could not and cannot afford any of these payments and still maintain a minimal standard of living.

Although the Court does not condone Plaintiff's failure to make payments on the Loans or his failure to make more of an effort to renegotiate the Loans, the Court concludes that Plaintiff did not have sufficient income during the repayment period to make even minimal payments. Given his circumstances, the Court finds that the failure to attempt a further renegotiation of the Loans does not indicate a lack of good faith.

The Court concludes that Plaintiff has met the elements of the *Brunner* test and that he is therefore entitled to discharge of the Loans. Plaintiff's counsel is instructed to prepare an order incorporating by reference this letter ruling and a judgment.

Very truly yours,

*Karen A. Overstreet*

Karen A. Overstreet
Chief Judge